at all, or argument 15 minutes per side. Mr. Goldberg for the appellant. Good morning. Good morning, your honors. I'm Jerome Goldberg for the appellant. I do wish to reserve five minutes for rebuttal. Very well. You may proceed. Your honor, this case has been, as you said, thoroughly briefed, and obviously if there are any questions, I'm welcome to hear them, which I would assume there are many. But I'll just address a few was a tenured professor and is a tenured professor at the University of Michigan. She's been a tenured professor in the law school since 2008. And at the time of this discipline, she was the only African-American woman tenured professor at the university who was active. I won't deal with the prima facie case, which the judge went into fairly thoroughly in his discrimination against both the university and against Dean Mark West, and as well as prima facie case on account of Equal Pay Act. The other side is appealing that ruling. You may want to briefly touch upon it. Well, that ruling, as the court held, they identified a comparable in the case, Mr. Ryman, who was guilty of a great deal of abuse against many women and other individuals at the university who never was disciplined. And this centers around Professor Benny, to the extent that this discipline is around her alleged abuse of other individuals in the university, most professors and co-workers, they identified a comparable in Professor Ryman. Was the misconduct by the alleged comparable, did it involve abandoning duties on the job? No, it did not. They raised the abandonment as a, in the pretext context, but I'll discuss the abandonment, which I feel is a completely bogus issue. Is there not also a distinction that in her case, her prior activities had led to formal discipline that was in her record, and have we not had cases that indicate that when an employer is looking at what to do with somebody, a person who has had affirmative discipline in their record is not similarly situated to a person who has no formal discipline in their record? Well, that's true, that may be true, but in this case, Professor Ryman was guilty of a long pattern of abuse, as testified by many individuals in this case. Still, none of that resulted in formal discipline in his record, am I right about that? No, but on the other hand, that really goes to show the discrimination, where he was never given a discipline for any of that activity, where Professor Benny was disciplined. She also disputes the validity of those disciplines, and we went into some of that in our brief, and the judge also looked at those disciplines as well. Also, in the retaliation context, the judge credited that she had made complaints of civil rights violations, really within the couple months before the discipline was issued, and so her retaliation count was raised based on the temporal proximity of the disciplines to the discrimination claims that she made, both with the Internal University Discrimination Committee, the ECRT, as well as with the EEOC. The other thing I would say is on the Equal Pay Act, the prima facie case simply requires that she identify a comparable whose wages are different than hers, whose activities are essentially the same. In the university context, they operate under what they call a lock-step policy, where each professor is identified with another professor who is considered comparable in terms of their jobs, their extent of experience. Her comparable in that context was John Hotow, and her wages were supposed to be in lock-step. They would go up comparable to the professor. They did. At one point, they didn't. She had filed a previous complaint on that, which was granted, but in this case, on the Equal Pay Act, the result of this discipline was that she received a cut in her pay that amounted to $30,000 a year in base salary, approximately $30,000 a year in base salary for each year for over a five-year period. So everybody that ever gets disciplined with a pay freeze or whatever is going to have a prima facie case? I'm not saying that, but they have to identify a comparable, and in this case, she had an exact comparable. In an academic context where it's a lock-step or any job where it's a lock-step, the comparable is just going to be the person that didn't get disciplined because they continued to get the raises, right? Well, in this case, it was a white male. It does at least establish the prima facie case, which then the defendant then has the duty to produce an affirmative defense that it was not based on, that there were other reasons for the discipline. And we submit that the affirmative defense, the affirmative defense in this case, fails because it's really based on the question from fundamentally that she abandoned her class on February 15th, abandoned teaching. That issue was addressed by the court, and in fact, the court held and noted that the university granted her an FMLA leave that was retroactive to February 15th, the day she allegedly abandoned her class. So they accused her of abandoning her class at the time when she was actually on a medical leave granted by the university. And so we submit... You mean the day that she abandoned her class, she had approved FMLA? No, the FMLA leave... That's not the timing, as I understand it. No, the timing was she was suffering from the stress that caused her to apply for the FMLA leave, and she applied it, but the FMLA leave... My recollection is she didn't call it FMLA leave. She called it like workers' comp or something. She made an application for disability. She called it workers' comp. As was noted in our briefs, she did it with the work connections off, which is the same body that adjudicates or looks at all disability claims, whether they're workers' comp or FMLA. And they noted in communication, and it's cited in the brief, that really whether it was an FMLA claim or workers' comp really was just a question that they straightened out. But it was under the same factual basis that she was disabled from working, and they granted that the disability started on February 15th, the day she was accused of a bad event. Hey, I'm having these health problems. I'm not going to be able to continue teaching my class for the rest of the semester. Let me help you find somebody to replace me. I'm going to apply for FMLA leave. It sounded like she just abandoned her class in the middle of the semester without telling them, Hey, I'm having this problem, and I need to get this leave or whatever. Actually, as the brief points out, she notified them immediately upon stopping that she could no longer teach the day she stopped teaching. She was in communication with the associate dean. It had nothing to do with her health, did it? She just said, you know, you guys are bad guys, and I can't put up with you anymore. Well, what she said is due to the stress that she was suffering as a result of the discrimination, she could no longer go on teaching. She did notify them immediately, and she notified the students that she was involved with in terms of being an advisor immediately. So she did notify them immediately. She did not claim, she did not apprise them of applying for disability immediately. The disability claim was made somewhat later, but the university recognized that it was retroactive. And they're the people, the defendants in this case, they recognized that it was retroactive, that in fact, on February 15th, based on their examination of the medical records, that she was no longer able to teach. So the stress really, they recognized it as a medical problem, and that's very clear in the records. Okay. And one of the issues around this abandonment issue is really what the defendants claim, is they weren't apprised of the FMLA leave at the time. They had no knowledge of her application. The discipline wasn't until March 31st, and their claim is that they had no knowledge of the pending disability claim until it was granted on April 15th, and that is belied by the records, which show that, at least taking the evidence in the most favorable light to the appellant, that at the time she applied for them on February 27th, she identified her supervisor, who was Dean West. Dean West communicated in the letter, when they told her, acknowledged the application, they sent a copy of that letter. They acknowledged, they sent a copy of the letter to the supervisor, who is Dean West. So there's at least a question of fact of whether, in fact, he was apprised that there was a pending disability. And for the honest belief to operate, even though it wasn't approved at the time, he at least had the duty to investigate whether or not there was a pending disability claim, and he did not. And he testified. And he even testified that he was at least somewhat aware of it, that he didn't acknowledge any communication, that he was somewhat aware of it, but did no investigation. And the honest belief, what they take is an extensive view of this honest belief, well, okay, you just give it credence, but I would contend, and we would contend, that you can't give it, that the evidence has to be taken in the most favorable light to the appellant, and in this case, the evidence does establish that their own work connections, their own disability body notified the supervisor of the claim, so they had notice of the claim. Moreover, on the Equal Pay Act, where the burden is higher, the burden of proof is on them, they would have to prove this issue. And really, taking the evidence in the most favorable light to the appellant, we contend that they had knowledge of at least a pending disability claim, and they just chose to ignore it and discipline her. And that's one of the issues in this case. Joel Berg, you've got five minutes for rebuttal. You can use it now, or you can save it. Well, I will use my last issue. I do want to address one more issue. And that issue that's important is the fact that as a tenured professor, she was entitled to due process under the university's own regulations. And the due process for a tenured professor is pretty extensive, that she has a hearing body, an independent hearing body, she can present evidence. But you don't have a procedural due process claim, do you? Well, we have a claim that they violated their own policies in carrying out the discipline by not pursuing their own policies. So you're using it to show that it's pretext. We're using it to show that it's pretext. And based on that, and it's case law, even though, and we will acknowledge, it was pled, and it was argued in the response to summary judgment. It was not argued in front of the judge because there's so many other issues, as we're seeing here. But, in fact, the court has the ability and can entertain that argument, even if it wasn't specifically pled. Okay, it wasn't pled, it wasn't preserved? It wasn't argued in front of the judge. It wasn't raised in the district court? It was raised in terms of... Well, it was raised in the brief in opposition to summary disposition. It was not raised in the argument on the summary disposition motion. Okay, you say it was raised in your brief in opposing summary judgment. Yes, it was. And we would submit that even so, that this is one of those exceptional circumstances which allows the court to consider this issue. It's a fundamental issue. Due process, as we all know, is a huge issue. It's being considered by courts all over the country and upheld by courts all over the country. And in this case, she was... And she actually raised this issue when she received the discipline. The first thing she did was write about my rights to a hearing under the university regulations. What text do you have on the pretext question? I guess that's what I'm wondering about in this case. I mean, the final disciplinary letter, it's 15 pages. It's pretty comprehensive. And I'm just struggling to see what's pretextual. Where is that? Well, I would contend, and we would contend, that the real issue in this case was the abandonment issue. And the dean, who was the decision maker... But the letter has all kinds of things. It does. Emails, I mean, all of it. It's not just the abandonment. I mean, you have to acknowledge that. Yes, we spoke to that. But on the other hand, Dean West in his deposition testified in six different times in his deposition that the real issue was the abandonment issue. That the other issues were raised in the letter, but the basis for the discipline was the abandonment issue. And that's why we focused on that in terms of pretext. On the other hand, there are issues of fact. The one issue was dealing with an anonymous complaint made about her conduct in class. And, in fact, that complaint was investigated by their own people. The associate dean went to the class and spoke to the class and found, really, there weren't complaints like that. And so, first of all, that's a question of fact. And the emails, most of the emails, the centerpiece of the emails, were emails dealing with Professor West's inappropriate emails to Miss Benny, Professor Benny, over a period of time. And those were the emails that she sent out. And the case law is pretty clear that if you were the one accused of discrimination, that you should at least step aside when the determination is made on those issues. And here, really, the centerpiece of these emails were inappropriate emails from Professor, from Dean West, that his own associate dean acknowledged were inappropriate. Yet he was the one who made the decision on the discipline. So you're saying the emails that she sent to other professors and other deans, it's excused, essentially, because it was about what Dean West had said to her? Fundamentally, the emails she sent out to other professors were emails about what Dean West had said to her, yes. Yes. All right. Any further questions at this time? Judge Box? The last thing, maybe I'm wrong, but I thought that, in effect, the agitation or the discovery of West's emails came later. I mean, I read most of the stuff that was in the briefs, and most of her emails do not advert to the business with the picture and so on. She's talking across the board about you're racist, you're evil, and so on, isn't she? Are you saying that her emails all or mostly advert directly to his statements? The emails that sort of had that character were pretty much limited to the administration when she was complaining about their failure to investigate discrimination. The emails to her co-workers fundamentally dealt with the issue of sending out the emails, and then her frustration with the lack of response. Of course, West escalated that saying that she presented a physical threat, called in the police, who completely rejected that. And when I interviewed several, and I put the testimony in the brief, a number of the people that were allegedly the complainers of being physically threatened all testified that they never felt physically threatened by them, that she was expressing frustration, and rejected that. One person that he relied on primarily was McQuaid, and McQuaid herself testified. She didn't know Ms. Benny, and even the judge didn't give much credence to that testimony. They relied on one email from an Alicia Davis, but that's basically a hearsay email. She was never testified. There was no testimony on that whatsoever in this case, except for Professor Benny's testimony, who testified that her conversation with Alicia Davis was not a threatening one, she was frustrated by the lack of response to what she saw was racist treatment against her. All right. Thank you, Mr. Goldberg. We've used a lot of your time, but I'll grant you three minutes rebuttal. I appreciate it. Thank you, Mr. Honors. Let's hear from the defendant appellee. Good morning. Good morning, Your Honors, and may it please the Court. Amanda Rice for the University of Michigan. The district court correctly ruled that no reasonable jury could find that the university's legitimate reasons for disciplining Professor Ben, which are laid out in a detailed 15-page letter, were pretext for retaliation or discrimination on the basis of race or sex. You can affirm that ruling on either of two grounds. I think the first and most straightforward is pretext. Professor Ben primarily challenges that ruling here today and in her briefs on the ground that the FMLA leave designation, which was issued two weeks after she was disciplined, undermines the university's legitimate reasons for disciplining her. That's wrong for at least three reasons. The first is that the decision-makers didn't know about the leave request at the time she was disciplined. As you pointed out, Judge Boggs, there's no suggestion in her e-mails or in the meeting that was held with Professor Ben and her lawyer that she had left for health reasons or was planning to seek leave. As I think you pointed out, Judge Nalbandian, she didn't even notify the work connections office that she was seeking FMLA leave until after she was disciplined. Second, as this court has recognized in cases like Yarraberry, employers don't have to ignore misconduct just because an employee later attributes it to disability. And then third, Professor Ben's abandonment of her teaching responsibilities was just one of several legitimate grounds for her discipline. You don't have to go any further than that, but if you have any doubts about pretext, you can also affirm on the prima facie case. Professor Ben didn't identify a similarly situated comparator for a discrimination claim or a causal connection for her retaliation claim. Why is Ryman not a comparator? Professor Ryman's misconduct differed from Professor Ben's in at least three ways. First is there were different rule violations. He didn't abandon his responsibilities. He had some rude remarks to staff but didn't do the sort of primary thing that's at issue here in this disciplinary notice.  So is the abandonment the key as far as you're concerned? I think that the disciplinary letter sort of speaks for itself. The abandonment of the responsibilities was certainly the culmination of the misbehavior and I think is what prompted this disciplinary action. The remarks, there's a lot in the disciplinary notice about the remarks, the emails. I mean, it is a big part of it. So I guess I'm just curious if Professor Ryman is also making remarks or talking to staff, whatever it is. I mean, that seems comparable. I mean, maybe not the entire package, I guess. Yeah, I think you're right in a sense. It's not the entire package, so there's not the other piece, the abandonment. But even as to the remarks, I think the quantity and the kind of rule violations that Professor Ben engaged in here. There's just a sampling of those emails at pages 4208 to 414 of the record compared to a couple of comments that Ryman is accused of making. And then there's the prior discipline. As I think was pointed out earlier, Professor Ryman didn't have any instances of prior discipline and employers can... That's because he was being treated favorably. I mean, it's hard. I always find that one to be difficult. Yes, there are prior... I mean, but it depends on how far back the discrimination goes. Or if somebody is getting treated more favorably, then yeah, they were disciplined, right? I think the key is there aren't allegations of conduct that would have justified prior discipline. There's a couple of comments here. I think there's three or four incidents. There was some discipline that later happened for Professor Ryman, but I think the discipline was for conduct that was really different in kind. I think the abandonment is the clearest point in the way that they're different. But again, you don't have to reach prima facie case. You can resolve this case on pretext like the district court did. I think that's more straightforward. There's clearly a legitimate basis for the discipline here. I mean, zooming out, the question is whether there's pretext for race or sex discrimination or for retaliation. And the undisputed facts here make clear that there's not. We know that Professor Ben walked out on her class leaving 30 students without a professor. We have that in her own words in the e-mails that she sent. We know that she withdrew from student dissertation committees. Again, we have that in her own words in the record. She failed to attend or evaluate assigned courses, faculty meetings, job talks. I don't think any of that's disputed. The inappropriate e-mails are there, again, in her own words, and the two incidents of prior discipline. So it's all laid out in the letter. I don't think any of it's disputed, and the FMLA leave doesn't excuse any of it. I'll speak briefly on the due process argument. My friend on the other side attempted to raise in his briefs, and again this morning, I think that argument's pretty clearly forfeited. There is no due process claim in this case. There just isn't. And the bylaws weren't raised below in connection with pretext either. My friend suggested they were raised in the brief. They weren't. There's a sentence, half a sentence, in the statement of facts, but not in the argument section, just referring to the fact that she didn't receive a hearing. It's not an argument that that's a basis for finding pretext here. And there's not extraordinary circumstances that could justify excusing that forfeiture. I mean, why didn't she get a hearing? It seems a little odd that she would just get a pay freeze and some other things that are fairly significant. The policy in question applies to demotions, and she wasn't demoted. To be demoted means to be moved down. She didn't receive, you could say she didn't receive a promotion. A cut. Well, I mean, the person you're in lockstep with is getting a raise, you're not. I guess that's technically not a cut, but it's not good. I take the point that it's not good. It was discipline. It was not meant to be good. But it's not a demotion. Demotion, literal meaning of the word, means to move down. What would that involve for a tenured professor who isn't fired, like removing her endowed chair? We always talk about going from assistant to associate. Can you push somebody back from associate to assistant professor? I believe you can. That would be a demotion, certainly, and a pay cut would be a demotion, moving someone down. We cited a case called Faramon from the Michigan Court of Appeals dealing with this argument about what constitutes a demotion. The argument there was similar to the one here. The employee didn't receive a pay raise that they'd expected and argued that they'd been demoted. The court said that's just not a demotion in the way we think about demotions. I'm happy to answer any other questions the court has on … On what? On anything at all. But if the court doesn't have anything in particular, just a couple of remaining points. I think the easiest way to think about the pretext issue, again, is to look at what the decision makers knew in this case. They didn't know that she had left her class for medical reasons. They didn't know she was seeking leave at the time she was disciplined. I think that's pretty straightforward. But I also think it's important what this court said in Yarbrough, that employers can discipline employees for misconduct, even if they later attribute it to a disability. It would create some pretty unfortunate incentives, I think, to say that employers … It seems like that raises a fact issue, if you have both of those things in conflict. The FMLA situation and the disciplinary situation. Yes, you can, just because somebody has a disability or is on medical leave, doesn't mean you can't discipline them. But it becomes a messy situation, doesn't it? I don't think so, Your Honor. I mean, I understand. I suppose in this case you're saying it's not. Yes, in this case it's not for, I think, at least two reasons. The first is the knowledge issue. The decision makers here, and you focus on the decision makers. This court said that in EEOC v. Ford and also in Escher. You have to focus on what the decision makers knew. But even assuming decision makers understood this was a result of a disability, I think it's also important that this isn't a disability case or an FMLA case. Some of the other cases where this issue has come up are in those contexts. So the question is whether somebody was disciplined for a disability or for taking leave. And that's not the issue here. The question is whether it shows pretext for race or sex discrimination. I don't think there's any way to infer that, at least on this record. I think we've covered just about everything that I wanted to touch. If the court has no further questions. All right. Thank you, Ms. Rice, for your argument. Mr. Goldberg, three minutes rebuttal. I move slow, sir. Pardon? I move slow, sir. Oh. Let me just address a couple of issues she raised. One on the issue of the demotion. Actually, the Faculty Senate defines demotion as a cut in pay. And I attached that. It was not part of the initial record in this case, but I did attach that as a supplement in the appendix. But it specifically defines demotion as a cut of pay. And the judge himself ruled that she was demotioned. When you receive a $30,000 to $50,000, because it wasn't just a pay cut, it was also she lost privileges for $5,000 a year for being able to do research and $10,000 for being able to summer pay. So it was clearly a demotion under the university regulations that should have entitled her to due process. Secondly, as my fellow counsel argued, really the centerpiece is the abandonment claim. And on that abandonment claim, the discipline wasn't until March 31st. She applied for the disability, and whether it was called disability or worker's comp it was with the same body, on February 27th. The record reflects that they sent an email to Dean West informing him of that issue, that she had a disability. So he should have known on March 31st that she had a pending disability. And under the law, he had a duty to qualify for an honest belief. He was mandated to do at least an investigation of that issue. And had he done an investigation, even a minor investigation, he would have found out that she had a disability claim. Moreover, the disability was granted as of April 15th, and certainly the discipline could have been lifted at that point since it was a forward-looking discipline, and they chose not to do that. So we think those are bogus issues, that they had knowledge. And under the Equal Pay Act, it goes further because they have the burden of persuasion and the burden of proof on the affirmative defense on the abandonment. And we believe, taking the evidence in the most favorable light to a plaintiff, they cannot satisfy that burden of proof. So the burden is higher on the Equal Pay Act as an affirmative defense than it is even under the pretext analysis. So I think those are the main issues I wanted to address. And I thank you for giving me that time to do that. I appreciate it. You're welcome. Thank you. Thank you for your arguments. The case will be submitted.